385 So.2d 973 (1980)
Viola Marcum GAY et al.
v.
Henry TOMPKINS and Eugenia Tompkins.
No. 79-206.
Supreme Court of Alabama.
July 7, 1980.
*974 Isaac P. Espy of Tucker, Gray & Espy, Tuscaloosa, for appellants.
George S. Wright of Rosen, Wright, Harwood & Albright, and Gordon Davis, Tuscaloosa, for appellees.
*975 BEATTY, Justice.
Plaintiff-appellant Viola Marcum Gay brought suit seeking a sale in lieu of partition against ten defendants. Eight of the ten defendants answered and admitted the averments of the complaint and agreed to a sale. Defendants-appellees Henry Tompkins and Eugenia Tompkins denied the allegations of the complaint and alleged that they alone had title to the subject property.
All of the parties derive title out of J. G. Marcum, deceased. All parties, but the Tompkinses, are children of J. G. Marcum. Any title the Tompkinses have derives from a deceased child of J. G. Marcum, one R. S. "Buck" Marcum.
The sole issue at trial was the extent of the title the Tompkinses received from R. S. "Buck" Marcum. The extent of that title turns on the efficacy of a "bond for title" which R. S. "Buck" Marcum received from his father, J. G. Marcum.
J. G. Marcum owned the subject property prior to October 24, 1956. On that date he executed a "bond for title" to his son R. S. "Buck" Marcum. J. G. Marcum died intestate on July 31, 1962 and at that time his son, R. S. "Buck" Marcum was four months delinquent in payments called for on the "bond for title." Out of $4,500 contracted to be paid, R. S. "Buck" Marcum had paid $3,600 but he never paid the remaining $900.
Shortly after his father's death R. S. "Buck" Marcum mortgaged the subject property along with another tract which is not involved in this proceeding, and a 1959 Cadillac automobile, to secure an indebtedness of $4,000 to Henry Tompkins and Eugenia Tompkins (appellees). This mortgage was foreclosed on August 27, 1966 and the defendants-appellees, the Tompkinses, either succeeded to all of R. S. "Buck" Marcum's one-tenth interest in the property by virtue of R. S. "Buck" Marcum's inheritance or to the entire interest, if the "bond for title" to R. S. "Buck" Marcum was efficacious to convey the fee of J. G. Marcum to R. S. Marcum.
The trial judge, after a bench trial, made findings of fact and conclusions of law, and entered a decree which reads, in part, as follows:
The Court further finds that such Bond for Title dated October 24, 1956 had provision as follows:
"This Contract shall at the option of the party of the first party only, be terminated...."
The Court further finds that there never has been any acceleration of the Bond for Title and that the option granted to J. G. Marcum to terminate said contract was never exercised prior to the filing of the suit on February 23, 1978. The Court further finds that the option to enforce the forfeiture of the rights under such Bond for Title had never been exercised by J. G. Marcum or any other party prior to the date of the suit, February 23, 1978. The Court further finds that Reuben S. Marcum and his successor Henry Thompkins [sic] and Eugenia Thompkins are ready, willing and able and have by their pleadings offered to pay the balance due under such Bond for Title ($900.00); that such default by Reuben S. Marcum Thompkins was not willful or intentional and that there is no inequitable conduct which would have barred Reuben S. MarcumThompkins by some other controlling doctrine of equity from curing the default; that under the principles of equitable title but not legal title, Reuben S. Marcum had, and Henry Thompkins and Eugenia Thompkins have a valid equitable title to such premises; that said Reuben S. Marcum as of October 24, 1956 went into actual, open, peaceful, notorious, and continuous possession, under claim of ownership, from October 24, 1956 until his death on December 1, 1976 and one or more of said Reuben S. Marcum's children continued to occupy such premises as a tenant at will after the date of Rueben S. Marcum's death On December 1, 1976 until the date of suit, February 23, 1978; that Reuben S. Marcum has annually listed the land for taxation in Tuscaloosa County from 1957 until 1973 *976 and thereafter from 1974 until 1978, when suit was commenced, Henry Thompkins and Eugenia Thompkins have assessed the property so that the annual listing of the land for taxation requirement of Section 6-5-200, Code of Alabama, 1975, subparagraph (2) has been fully complied with; that all of the requirements of prescription for over 20 years have been complied with; that the suit was not filed within the actual statute of limitations as set out in Section 6-2-33, Code of Alabama, 1975; that upon the death of J. G. Marcum, there was no administrator appointed and no executor appointed, nor anyone in the representative capacity to represent the estate of J. G. Marcum was appointed to collect the $900.00 balance due under such Bond for Title, consequently, there was no personal [representative] for Reuben S. Marcum to pay after the death of J. G. Marcum.
IT IS THEREFORE, CONSIDERED, ORDERED, ADJUDGED AND DECREED that the Plaintiff, Viola Marcum Gay has not met the burden of proof that she is in fact a tenant in common so that she is not entitled to a sale for division of the premises herein; that this proceeding being brought in equity and recognizing equitable principles, the Court orders and determines that the equitable title in such premises is vested in Henry Thompkins and Eugenia Thompkins; that not only the equitable title but also the legal title is now vested in said Henry Thompkins and Eugenia Thompkins by virtue of 10 years adverse possession under Section 6-5-200, Code of Alabama, 1975, under Section 6-2-33, Code of Alabama, 1975, and under 20 years prescription, subject to the payment of said $900.00; that Doris T. Turner, Circuit Clerk, is ordered and directed to execute a deed pursuant to the order of this Court to the said Henry Thompkins and Eugenia Thompkins vesting in said Henry Thompkins and Eugenia Thompkins all of the right, title and interest, if any, in the heirs of J. G. Marcum, so that any interest, if any, in said 10 heirs of J. G. Marcum is divested out of [them] and vested in the said Henry Thompkins and Eugenia Thompkins, such heirs interest being divested is listed as follows: Reuben S. Marcum, Mary Elizabeth Marcum Saul, Viola Marcum Gay, George P. Marcum, Oscar Grady Marcum, William O. Marcum, Irene Marcum Johnston, Talmadege Clayton Marcum, Nell Marcum Schryer, and Linda Marcum; that it would be unequitable and unconscionable to allow forfeiture to be declared in this case wherein the successors to the purchaser are ready, willing and able to pay the balance under the Bond for Title being $900.00-$3,600.00 being paid upon a $4,500.00 purchase; that [neither] J. G. Marcum during his lifetime nor his heirs prior to filing a suit on February 23, 1978, had ever exercised the option to accelerate the balance due under such Bond for Title nor had any forfeiture been declared by J. G. Marcum nor any of his successors prior to the date of suit, February 23, 1978; that this Court being a Court of Equity, will recognize the equitable title under such Bond for Title and also recognize the legal title vested by way of adverse possession and prescription in Rueben S. Marcum and now Henry Thompkins and Eugenia Thompkins; that upon payment of the balance due of $900.00 on such Bond for Title by Henry Thompkins and Eugenia Thompkins, then Doris T. Turner, Circuit Clerk, shall execute such deed as set out hereinabove.
Appellants, the siblings of the late J. G. Marcum, present numerous issues on appeal which may be summarized as follows:
(1) Whether the trial court erred in permitting the successors-in-interest (the Tompkinses) of the vendee to redeem the bond for title which was in default for seventeen years, when the instrument states that "time is of the essence";
(2) Whether the court's finding that the Tompkinses have adversely possessed the property for the requisite period or have satisfied the requirements to obtain title by prescription is contrary to the law and evidence; and,
*977 (3) Whether the ten-year statute of limitations for the recovery of lands has been tolled.

BOND FOR TITLE
The thrust of the Tompkinses' argument is that the law in Alabama treats bonds for title as an equitable mortgage on the land; therefore, they say, they could redeem the bond prior to a foreclosure, even if the payments under the bond have been in default. We disagree with this argument.
The portion of the bond for title, pertinent to the issues presented, reads as follows:
The party of Second Part [Buck Marcum] agrees to pay promptly and strictly in accordance with the terms hereof each installment as it falls due; and if the Party of the Second Part shall fail to pay any one of said installments on the day the same falls due and such default shall continue for thirty days, time the essence of this contract, this contract shall at the option of the party of the First Part [J. G. Marcum] only, be terminated, and the Party of the First Part, his agents or assigns, may reenter upon the said property and take possession thereof, and in that event, all rights and interests given to the Party of the Second Part by this contract shall cease and terminate, without any right in the Party of Second Part of reclamation for any monies paid, or improvements made under this contract; but all monies so paid shall be and remain the property of the Party of the First Part and shall be held and retained by him as compensation for the rent or use and occupation of the said property, and the Party of Second Part agrees to peacefully surrender possession of the said premises. The Party of First Part shall have the option to waive the forfeiture of the rights and interests of the Party of the Second Part in this contract on default in the payment of any of the said installments, but the waiver of such shall not be construed as a waiver of any other default occurring subsequent thereto....
The appellees place much of their reliance upon an article, "Bonds for Title in Alabama," 3 Ala.L.Rev. 327, for the broad principle that the vendee "acquires an interest that he may convey or demise, and as land it is descendible to his heirs. His equity of redemption is in the form of a bill for specific performance in which he must aver that he is able, ready and willing to pay the amount found due by the court." 3 Ala.L. Rev. 329. That latter statement is correct as long as it is understood that it does not refer to a real estate mortgage, but only to the remedy of specific performance of a land contract. Ashurst v. Peck, 101 Ala. 499, 14 So. 541 (1894) is the forerunner for the quoted proposition. There the vendee's successor brought a bill of equity for specific performance of a contract to sell land in which he offered to pay the balance due and take title from the vendor's administrator. The vendor's administrator had refused payment because he was ignorant of the amount due, and the pleadings themselves cast doubt upon the validity of the notes given by the vendee which evidenced the purchase price. In reversing and remanding for trial, that Court by dictum gratuitously alluded to the relationship between the vendor and the vendee:
It is a familiar rule, declared in many of our decisions, that the relation of a vendor of lands, who has retained the title and bound himself to convey on payment of the purchase money, to his vendee, is analogous to that of mortgagee to mortgagor. All the incidents of a mortgage attach to it. We hold, therefore, that such a vendor in possession of the lands is accountable to the vendee or his assignee for rents and profits to like extent that a mortgagee in possession is accountable. [Emphasis added.] [14 So. 544.]
This statement was made in direct response to the claim of the vendee's assignee for rents and profits which had come into the vendor's possession following the vendee's death, and is consistent with the expressed relationship in equity between the vendor and vendee upon the execution of a contract for the sale of land:

*978 Upon entering into the contract of sale by Peck with Charles F. Ashurst equity treated Peck, the vendor, as the owner of the purchase money, and as trustee of the legal title to the land for the use of Ashurst, the vendee, and for his, the vendor's, security in the collection of the purchase money, by virtue of the lien which equity raises, in the nature of a mortgage, in favor of the vendor who retains in himself the legal title; ... [Emphasis added.] [14 So. 543.]
The use by equity of the real estate mortgage as an analogy for the limited purposes of security and for rents and profits did not make the land contract itself a mortgage. Nothing in Ashurst leads to such a broad conclusion, and, especially, nothing therein gives to a contract for the sale of land the equity of redemption. And because Ashurst did not refer to that contract as a "bond for title," a fortiori any reference to an "equity of redemption" having been established for such an instrument as a contract for the sale of land is unwarranted.
In fact, the reference to a land contract as a "bond for title" is a confusion in terms. The earliest cases concerned land contracts in which, in addition to the vendor's promise contained in the agreement, the vendor also gave a bond conditioned on his making title to the land when the consideration was paid. Hays v. Hall, 4 Port. 374 (1837), is such a case. In that case the vendor, one James Hays entered into a contract in November, 1826 for the sale of land to Edmondson and Goodall. Under their contract the vendees gave two promissory notes payable one year apart, the first note to come due and payable in January, 1827. Hall and Lucas were sureties on these notes. A separate bond was made by the vendor to the vendees in excess of the contracted purchase price, "conditioned to be void, if he should, upon the payment, of the two notes, or soon after, convey a good and legal title..." to the vendees. (Emphasis added.) Ibid. at 381. The vendees then assigned this bond (not the agreement to convey) to Hall and Lucas to indemnify them against their incurred liability as sureties for the purchase money. Hall and Lucas were put in actual possession of the land, and Hall collected large sums of money as rents. Then Lucas and Hall contracted with one Betts to sell him the same land, taking Betts' promissory notes staged for annual payment over three years, and promising to make title after payment of that purchase money. Hall and Lucas rescinded the contract, before the purchase money was due, but Betts remained in possession. Following this, Hays, the original vendor, died a few months after the due date of the last of the promissory notes on which Hall and Lucas were sureties. Before his death the vendor had received the required installment payments after the due dates from the sureties after actions had been filed against the makers on the notes. The vendor's estate was in need of money, consequently Hall induced the vendor's administrator and the heirs of the vendor to themselves execute another bond (not a land contract), in the same penal sum as the vendor's bond, conditioned upon title being made to Hall within four months of its date. Four months was specified on the assumption by the parties that this interval of time was necessary to perfect a title through the then-existing Orphan's (probate) Court. Hall himself agreed to this and to no strict time requirement, while at the same time retaining the original vendor's bond. The administrator ultimately was unsuccessful in obtaining the Orphan's Court title, being informed that Hall himself (apparently because he was either in actual possession by then or because of his entitlement to it) would have to apply to that court for a title. The administrator requested this of Hall and Hall promised to comply but did not do so and, meanwhile, the four months condition on the bond to Hall expired. Even though the sole heirs agreed to make title to Hall, nevertheless he brought an action at law on the bond they had given to him.
The heirs brought suit for an injunction against that action, asserting a lack of consideration for the bond, and also for specific performance of the original contract. The trial court dismissed the suit, denying the *979 heirs specific performance (and retention of the land). On appeal that decision was reversed, with some pertinent conclusions having been made concerning the rights of the parties:
He [the vendor] was not bound to convey the title before the whole purchase money was paid, and he died in no default, because no right existed during his life to demand a conveyance from him. As he had acquiesced in the delay of the vendees to pay the purchase money, his personal representatives had a right to do so also ... At no time before the whole purchase money was paid, had the purchasers any ground upon which they could have been permitted to avoid the specific execution of the agreement. The effect of their own default was against them, and in favor of the vendor and his representatives; and all benefit from that default has been waived by those who might have claimed it (by taking the defaulted payments after they were due). If the last installment had not been paid, a bill might have been filed by the personal representative of the vendor to compel a specific performance... The vendor performed, during his life, a valuable part of the contract, by parting with the possession of the lands, and had a right before his death, as the last note became due prior to that event, to a specific execution of the agreement.
The principle is well settled, that where either party has performed a valuable part of his contract for the sale and purchase of an estate, and is in no default for not performing the residue, he shall have a specific execution of the other part of his contract, 2 Story's Eq. 82... The impossibility of placing a party in statu quo, who has performed a valuable part of his agreement, and was in no default for not performing the residue is another ground for the specific execution of the agreement. 2 Ib. 83. If the sale could not be executed, the heirs of the vendor would be injured by the consequences of duties omitted, or of acts which were not the vendor's or their own. Time may be of the essence of an agreement in a Court of Equity. It is always essential, when it is made so by the terms of a contract; and it is considered so by some able Chancellors, in every case in which the party who seeks relief has been in default himself, without any just excuse, or any acquiescence or subsequent waiver by the other party. 2 Story's Eq. 85, 86, note 1....
. . . . .
If the payment of the money and the conveyance of the estate, are according to the agreement, to be made at the same time, the personal representative would have a right, in a case where the time agreed upon for performance was not of the essence of the contract, if in no other case, to a specific execution of the agreement, if he applied to a Court of Equity for the purpose, in a reasonable time after the day for performance.
In reversing the lower court, this Court found that the parties had not made time of the essence, and so no day was fixed for the conveyance of the title; the vendor's bond required him to convey the title "soon after" payment of all the purchase money. His bill for specific performance was thus timely brought. The Court also held that the bond given by the complainants was without consideration because the complainants' promise to make title was to be performed after the payment of the purchase money note by Hall. Hall's promise to pay the installments was what he was bound to do. This promise was thus found to be independent of the promise to convey title and did not support the complainants' undertaking on their bond. Therefore, the Court remanded the case for a compliance with the principles expressed.
In that connection it is significant that the Court made the following observation regarding an "equitable mortgage":
The assignment by the vendees, of the vendor's bond to Hall and Lucas, created in favor of the latter persons, an equitable mortgage. If the purchase money which the sureties paid, did not belong to the vendees, and has not been repaid by *980 the vendees, the sureties in this case, have a right to the estate, as mortgagees, upon a decree for the specific execution of the contract, in favor of the complainants.... [4 Port. 388.]
This statement makes it clear that the doctrine of "equitable mortgage" did not apply to the relation of vendee to vendor under a land contract, but only to the "bond" aspect, if any, of any such transaction. In other words, the parties to the land contract could rely upon the principles governing the right to specific performance. But if, in addition, a vendor's "bond" was given, and that bond was assigned to a vendee's surety, the bond gave that assignee a right in the land which he could exercise against the vendees if they had not repaid the sureties. It is clear that this remedy was not against the vendor and did not give the vendee any "equitable mortgage" rights against the vendor.
The unfortunate references to a "mortgage" which thereafter crept into cases in which the "bond for title" was used to describe the contract have persisted. Forrester v. Granberry, 211 Ala. 402, 100 So. 551 (1924), for example, is a case in which no "bond" was referred to at all, the decision going off on the terms of purchase and sale and the question of entitlement to rents and profits. See also Bankhead v. Owen, 60 Ala. 457 (1877). The latter case dealt with the question of whether or not the transferee of a promissory note, given for the purchase money under a contract for the sale of land, could enforce the vendor's lien. In the course of its discussion of the relative rights of the parties, this Court stated at 466:
There can be no just and proper distinction drawn between a mortgage to secure the payment of the purchase-money, executed contemporaneously with the conveyance of the land, and a reservation of the legal estate, as a security for its payment [citing, among other cases, Chapman v. Chunn, 5 Ala. 397 (1843) in which a "bond" had been given by the vendor].... All concur that, when the vendor retains the legal title as a security for the purchase money, all the essential incidents of a mortgage attach. The vendor, retaining the legal estate, has the right to and in the land, on which he may maintain ejectment for the recovery of possession, compelling the vendee to resort to equity for a redemption, or rather, for a specific performance. The only remedy of the vendee is in equity for a specific performance. [Emphasis added.]
The so-called "equity of redemption," therefore, in reality is a suit by the vendee for specific performance, a suit in which the principles governing that remedy are to be applied, regardless of whether the land contract is described as a "bond for title" or not. And see Majors v. State, Ala., 336 So.2d 1098 (1976), in which it was held that "[A] `bond for title' has the legal effect of a contract to convey land."
In that connection it is pertinent to observe that the early cases dealing with the necessary allegations of the vendee's performance have changed. In Bankhead, supra, at 467 this Court specified that:
[T]he court can not intervene for his relief, unless he aver, and if the averment is not admitted, prove, payment of the purchase-money,the part of the contract he was bound to perform.
This requirement has been modified by our later cases, depending upon whether or not time of performance was made by the parties of the essence of their contract. It is an axiom of equity that as a general rule time is not of the essence of a contract. Isom v. Johnson, 205 Ala. 157, 87 So. 543 (1921). In Isom, however, this Court quoted from Barnard v. Lee, 97 Mass. 92, a recognition that the parties might make time essential by an express stipulation:
This equitable doctrine was formerly carried to an unreasonable extent, and the specific performance of contracts enforced after such a lapse of time and change of circumstances as to produce as much injustice as it avoided. In modern times, the doctrine has been guardedly applied; and it is now held that time, although not ordinarily of the essence of *981 a contract in equity, yet may be made so by clear manifestation of the intent of the parties in the contract itself... [Emphasis added.]
Mr. Pomeroy was also quoted, at 205 Ala. 159, 87 So. 544, not only for that principle but for an additional consideration:
The doctrine is fundamental that a party seeking the remedy of specific performance, and also the party who desires to maintain an objection founded upon the other's laches, must show himself to have been `ready, desirous, prompt, and eager.' 4 Pom.Eq.Jur. (4th Ed.) §§ 1408, 2234.
Thus, if a vendee seeking specific performance can show a waiver of the strict time requirement, he may still obtain specific relief upon an averment that he is ready, willing and able to pay, and offers the balance of the purchase price, with interest. Forrester v. Granberry, supra. In that case, the contract was entered into on November 8, 1919. The full price was $4,000.00, with $2,000 having been paid down and the balance to be paid in installments, the last installment due November 1, 1921. The vendee filed a bill for specific performance in November, 1923, alleging payment of the downpayment but failing to allege payment of the remaining balance. The Court held under the facts of that case that time was not of the essence and that a demurrer to the bill on that ground was not well taken.
In a similar case, Rankin v. Dean, 173 Ala. 60, 55 So. 217 (1911), equity granted the purchasers a specific performance of a land contract under which only Eight Dollars ($8.00) was owed.
The facts of this case are significantly different. Upon the execution of the contract here the vendee became entitled to the possession of the land, and all of the incidents thereof, including the rents and profits. Forrester v. Granberry, supra. From October 24, 1956, until the day this suit was filed, February 23, 1978, approximately twenty-two years, the vendee and his assignees have had the benefits of that possession. The vendee paid $3,600 for this 5.1 acres. In other words, up to the date of the final judgment, June 18, 1979, the vendee and his assignees were enabled to pay approximately $13.00 per month rent for the possession and use of these 5.1 acres of land. It is questionable whether these facts justify the description of a "forfeiture." To the contrary, for aught that appears it is they who are obtaining a bountiful deal. Moreover, the balance due of $900.00 on the contract represents 20% of the agreed purchase price. That is not an insubstantial sum under the precedents, so it cannot be reasonably argued that they have substantially performed the payment provisions of the contract. If there is an element of "unconscionability" here it should be applied against these assignees, not the complainants.
It cannot be denied that the contract contained a clause allowing the vendor to terminate the agreement upon the vendee's default in any installment payment. The contract contained other clauses, such as a "strict performance" clause and a "pay promptly" clause, both applicable to the vendee, and a clause allowing the vendor to waive the vendee's forfeiture upon nonpayment of installments, "but the waiver of such shall not be construed as a waiver of any other default occurring subsequent thereto." Both under the language of the agreement and upon general equity principles, the vendor cannot have intended to allow the vendee or his assignees an unlimited time in which to perform by paying the amount remaining of the purchase price. The facts of the instant case disclose the presence of a "time the essence" clause made in reference to payment of the installments. The vendor apparently did nothing to invoke his option to terminate. Such conduct on his part obviously constituted a waiver of payment under the specified contractual time but it cannot be reasonably supposed that he waived payment indefinitely. Hays v. Hall, supra. And there is nothing in the record to indicate any offer by the respondents here to perform the vendee's obligation. Indeed, the assignees wish to be given "redemption" rights which exceed those of a genuine mortgagor, who *982 by statute is allowed only one year, Code of 1975, § 6-5-230, and formerly was allowed only two years, Tit. 7, § 727, Ala.Code of 1940 (Recomp.1958). Here, however, the vendee and his assignees have had the use of the property since the vendor died on July 31, 1962, when the vendee was four months delinquent. From that time until suit was brought in February, 1978, almost sixteen years, they could have attempted to "redeem." As was stated in Majors v. State, Ala., 336 So.2d 1098 (1976):
Even if we treated the "bond" as a "mortgage," under the facts and circumstances of this case, the time for "equitable redemption" had expired.
Not only would the assignees here be barred from recovery under any analogy to the "equity of redemption," cf. Caudle v. First Fed. Sav. & Loan Ass'n, 295 Ala. 274, 327 So.2d 911 (1976), but they are also barred from recovery by their laches. Here they rely upon rights which they now affirmatively assert under their predecessor's contract. They can obtain those rights only by performing his obligation of full performance, yet they have waited since August 27, 1966, the date they foreclosed R. S. Marcum's mortgage of his interest to them, to assert any claim under his contract with J. G. Marcum. W. T. Smith Lumber Co. v. Barnes, 259 Ala. 164, 66 So.2d 77 (1953).
Additionally, the appellees place reliance upon the failure of the vendor, J. G. Marcum, to exercise his option to terminate the contract for nonpayment of the installments due. We have already commented upon the effect of this upon the contractual requirement of payment itself. Although the appellees' point would be important were this a contest between the vendor and vendee, there are additional considerations which show that the vendor's failure is without force under these facts.
When the vendor died in 1962, the vendee was four months behind in his installment payments. Within those four months the vendor had not exercised his option. Upon the death of J. G. Marcum, the vendor, his vendee, R. S. Marcum, inherited a 1/10 interest in this property. He and the other heirs stepped into the vendor's shoes. What purpose would have been served by requiring R. S., as an heir-owner, to give himself and his brothers and sisters notice of his own default and the concurrent exercise of the option to terminate? Any such notice to R. S. would not have changed the right to possession of the property because R. S. was legally a tenant-in-common with the vendor's other successors in title. And later notice of the exercise of the option would not have served the Tompkinses because they never took possession. Furthermore, there is no legal efficacy to the trial court's finding that the vendor did not "accelerate" the "bond for title." The "bond for title" did not provide for "acceleration."
The trial court also held that the Tompkinses had acquired legal title by virtue of ten years of adverse possession pursuant to Code of 1975, § 6-5-200, and twenty years prescription. The trial court erred in making that determination. The finding that the vendee, R. S. Marcum, and his successors, the Tompkinses, had adversely possessed the subject property, against the vendor and his heirs, is wholly inconsistent with the finding that there was a subsisting agreement with the vendor under which they could obtain title by the payment of the amount due under the terms of the agreement.
The evidence shows that R. S. Marcum assessed the subject property for taxes from 1957 until 1973, and that the Tompkinses assessed the property for taxes from 1974 to date. Shortly after the vendor's death, R. S. Marcum mortgaged the entire fee, not just the one-tenth intestate interest he would have been entitled to otherwise. These facts are not determinative of the adverse possession claim. In short, R. S. Marcum was either a vendee, in possession, or he was a tenant-in-common at the time of his father's death. This Court has spoken on the issue of adverse possession by vendees and tenants in common. This Court stated in Monte v. Montalbano, 274 Ala. 6, 145 So.2d 197 (1962):
The possession of one tenant in common is prima facie presumed to be the possession *983 of all, and it does not become adverse to the cotenants unless they are actually ousted, or, short of this, unless the adverse character of the possession of one is actually known to the others, or the possession of the one is so open and notorious in its hostility and exclusiveness as to put the other tenants on notice of its adverse character. Ashford v. Ashford, 136 Ala. 631, 34 So. 10.
The mere fact that a cotenant in possession has taken all the rents and profits does not show ouster of his companions. Markstein v. Schilleci, 258 Ala. 68, 61 So.2d 75, and cases there cited.
Mere lapse of time and payment of taxes by one cotenant are not, in tenancies in common, necessarily acts of disseisin. There must be an entry and continuous exclusive possession under a claim of exclusive right. Possession and use by one tenant in common will not, of itself, repel the presumption that the possession is that of all the tenants in common. The intent to hold as exclusive owner, repudiating the rights of cotenants, must be established by proof and brought home to them.
Similarly, in Tensaw Land & Timber Co. v. Covington, 278 Ala. 181, 176 So.2d 875 (1965), Mr. Justice Harwood wrote:
The relation between the vendee in possession under an executory oral contract and the vendor is that of trust. This is the foundation of the doctrine that inhibits the creation of any rights in the vendee, affecting the title of the vendor, by the mere lapse of time, or presumptions usually arising therefrom. Rankin v. Dean, 157 Ala. 490, 47 So. 1015. If there is an entry, or a continuance in possession, under a contract of purchase, by parol or in writing, so long as the purchase money is unpaid the possession of the vendee is not adverse to the vendor, but in subordination to his title, and is not protected by the statute of limitations, or any presumption arising from the lapse of time. Collins v. Johnson, 57 Ala. 304; Bishop v. Truett, 85 Ala. 376, 5 So. 154; East Tennessee V. & G. R. Co. v. Davis, 91 Ala. 615, 8 So. 349.
We conclude, therefore, that the trial court also erred in finding that R. S. Marcum had obtained title by adverse possession.
Accordingly the judgment of the trial court is reversed and this cause is remanded for further proceedings in connection with the petition for a sale for division.
REVERSED AND REMANDED.
TORBERT, C. J., and FAULKNER, ALMON and EMBRY, JJ., concur.
MADDOX, JONES and SHORES, JJ., dissent.
BLOODWORTH, J., not sitting.
MADDOX, Justice (dissenting).
The thrust of the majority opinion is that the trial judge abused his discretion in allowing the Tompkinses, in effect, to redeem the bond for title prior to its foreclosure, even though their predecessor in interest, Buck Marcum, had failed to make payments under the bond as agreed. I do not believe the trial judge, after hearing the evidence, abused the discretion the law gives to a trial judge when presented with an equitable claim.
The portion of the bond for title, pertinent to the issues presented, reads as follows:
"The party of Second Part [Buck Marcum] agrees to pay promptly and strictly in accordance with the terms hereof each installment as it falls due; and if the Party of the Second Part shall fail to pay any one of said installments on the day the same falls due and such default shall continue for thirty days, time the essence of this contract, this contract shall at the option of the party of the First Part [J. G. Marcum] only, be terminated, and the Party of the First Part, his agents or assigns, may re-enter upon the said property and take possession thereof, and in that event, all rights and interests given to the Party of the Second Part by this contract shall cease and terminate, without any right in the Party of Second Part *984 of reclamation for any monies paid, or improvements made under this contract; but all monies so paid shall be and remain the property of the Party of the First Part and shall be held and retained by him as compensation for the rent or use and occupation of the said property, and the Party of Second Part agrees to peacefully surrender possession of the said premises. The party of First Part shall have the option to waive the forfeiture of the rights and interests of the Party of the Second Part in this contract on default in the payment of any of the said installments, but the waiver of such shall not be construed as a waiver of any other default occurring subsequent thereto...."
Appellees quote extensively from an article at 3 Ala.L.Rev. 327, entitled "Bonds for Title in Alabama" in support of their argument. In that article, the commentator, J. Thaddeus Salmon, discussed the rights of a vendee under a bond for title. The rights of a vendee are critical here, because the Tompkinses are the successors to the vendee's interest. Salmon wrote:
"Upon the execution of the bond the vendee is entitled to the immediate possession of the premises and the rents and profits therefrom. Failure to surrender possession will render the vendor liable to the vendee for the rents and profits of the land from which the vendor may deduct repairs and taxes but not improvements.
"The vendee acquires an interest that he may convey or demise, and as land it is descendible to his heirs. His equity of redemption is in the form of a bill for specific performance in which he must aver that he is able, ready, and willing to pay the amount found due by the court. The mere passage of time after the purchase money becomes due will not operate to cut off the vendee's equity of redemption; and at the instigation of an action of ejectment at law by the vendor, the vendee may bring his suit for specific performance, get an injunction to stop the action at law, and require the vendor to accept the purchase money, to satisfy the debt, and to vest a clear and unclouded title in the vendee.
"Since the vendor retains the legal title, and the interest which the vendee gains is not recognized by the law court, the vendee's interest is not subject to levy and execution, even though the entire purchase price has been paid; such a sale would convey no title to the purchaser.
* * * * * *
"The question of when a vendor may declare a forfeiture is also of primary importance. In 2 Pomeroy's, Equity Jurisprudence, § 450 (5th ed., Symons, 1941), the following statement is made:
"`It is well settled that where the agreement secured is simply one for the payment of money, a forfeiture either of land, chattels, securities, or money, incurred by its non-performance, will be set aside on behalf of the defaulting party, or relieved against in any other manner made necessary by the circumstances of the case, on payment of the debt, interest, and costs, if any have accrued, unless by his inequitable conduct he has debarred himself from the remedial right, or unless the remedy is prohibited, under the special circumstances of the case, by some other controlling doctrine of equity.'
"It is axiomatic that equity looks upon forfeitures with disfavor. As the court said in Root v. Johnson [99 Ala. 90, 10 So. 293], `Forfeitures are not favorites in equity, and unless the penalty is fairly proportionate to the damage suffered by the breach, relief will be granted when the court can give by way of compensation all that could be reasonably expected.' In Southern Inv. Co. v. Galloway where the vendee under a conditional sale contract for land had made payments according to the contract but failed to pay taxes, the court granted an injunction to restrain the vendor's action for unlawful detainer saying:
"`If the court permits the contract to be forfeited, complainant would lose $300 cash payments, and $250 in improvements. The complainant would lose $550, *985 and defendant gain it, if the contract is forfeited. If the contract is enforced, complainant will lose nothing, and respondent will not be damaged, but receive the entire purchase money, interest, and taxes paid. This being true, it should be enforced and not forfeited.'"
In Southern Inv. Co. v. Galloway, 206 Ala. 445, 90 So. 300 (1921), the court examined a bond for title similar to the one in this case and found:
"Time was made an essence of the contract. It provided for forfeiture of entire amounts paid in the event of failure of the performance of any part of it by complainant."
The court refused to declare a forfeiture and held as follows:
"Has there been a forfeiture? If yea, should it be permitted in equity, if the defendant has not been and will not be injured thereby and the complainant would be? We think not...."
"If the court permits the contract to be forfeited, complainant would lose $300 cash payments, and $250 in improvements. The complainant would lose $550, and defendant gain it, if the contract is forfeited. If the contract is enforced, complainant will lose nothing, and respondent will not be damaged, but receive the entire purchase money, interest, and taxes paid. This being true, it should be enforced and not forfeited. Root v. Johnson, 99 Ala. 90, 1 So. 293; Franklin v. Long, 191 Ala. 310, 68 So. 149.
* * * * * *
"The defendant has displayed a desire to get the property back and a determined effort to declare the contract forfeited. This it should not be permitted to do, as long as the complainant is ready, willing, and able to perform her part as shown by the allegations of the bill."
After reviewing the transcript, I agree with the trial court's finding "that the option granted to J. G. Marcum to terminate [the] contract was never exercised prior to the filing of the suit on February 23, 1978." Other findings of fact made by the trial judge are also supported by competent evidence. I think the majority, by refusing to indulge the traditional presumption accorded to findings of a trial judge, commits error; I would affirm that portion of the trial court's decree which finds that the option granted to J. G. Marcum to terminate the contract was not exercised prior to his death, and was not exercised after his death by anyone with legal capacity to exercise the option. I do not agree, however, that the appellees, as successors in title to the vendee, Buck Marcum, could prevent a forfeiture and obtain a deed to the subject property by the payment of the remaining $900 due under the agreement. I think the trial court properly applied equitable principles in refusing to permit a forfeiture, but I would agree that the trial court erred, in this case, in not assessing interest and costs, if any have accrued, on the $900 from the date the $900 was due. In Barry v. Welch, 248 Ala. 167, 26 So.2d 872 (1946), a case involving a mortgage, this Court set out an equitable principle which I would apply here, even though this case involves a bond for title. In Barry v. Welch, this Court opined:
"If the forfeiture be inserted in the contract merely as security for the payment of money, equity regarding the security of such payment as the real purpose of the contract may relieve the debtor from its consequences if the creditors' injuries can be adequately redressed (2 Pom.Eq.Jur., 5th ed., § 381), and unless the debtor's defalcation has been willful or intentional. `It is well settled that where the agreement secured is simply one for the payment of money, a forfeiture either of land, chattels, securities, or money, incurred by its nonperformance, will be set aside on behalf of the defaulting party, or relieved against in any other manner made necessary by the circumstances of the case, on payment of the debt, interest, and costs, if any have accrued, unless by his inequitable conduct he has debarred himself from the remedial right, or unless the remedy is prohibited, under the special circumstances of the case, by some other controlling doctrine *986 of equity.' Id., Pom.Eq.Jur. § 450." (Emphasis added.)
I disagree with the majority in its treatment of the bond for title issue.
JONES and SHORES, JJ., concur in the result.