Kenneth Hicks appeals from a summary judgment denying his claim against Cherry Dunn for specific performance of a contract for the sale of land. We affirm.
Hicks was an assignee to the rights of Kayo Booth and James T. Booth under a contract to purchase land from Cherry Dunn Hulsey and her husband, Malcolm Hulsey. The Booths had entered a contract with the Hulseys dated October 4, 1989, to purchase Lot 13 of the Lake Sherwood subdivision in Tuscaloosa County from the Hulseys. The contract, entitled a "Bond for Title",[1] was duly executed and recorded. Under the contract, the Booths paid $1000 to the Hulseys, and agreed "to pay promptly and in strict accordance with the terms [of the contract] the balance of the purchase price" on the closing date of October 3, 1990. By its terms, time was of the essence in the contract, and the Booths were given a 30-day grace period after October 3, 1990, in which to pay the $9500 balance remaining on the purchase price. The contract provided that, should the Booths default and fail to pay the balance within the 30-day grace period, the Hulseys had a right to re-enter and take possession of the land. All rights and interests given the Booths by the contract would "utterly cease and terminate" upon their default, without any right for reclamation of any moneys paid under the contract; any moneys so paid would be retained by the Hulseys as rent in compensation for the Booths' use and occupation of the property.
In a written "Bond for Title Subordination Agreement," which was executed and *Page 916 
recorded on January 3, 1991, the Hulseys and the Booths extended the time for performance of the bond for title to October 3, 1991.[2] Malcolm and Cherry Hulsey later divorced, and Malcolm Hulsey transferred all his rights, title, and interest in Lot 13 of the Lake Sherwood subdivision to Cherry Hulsey on July 29, 1991. Then, on August 22, 1991, the Booths assigned their interest in the bond for title to Kenneth Hicks. The Booths' attorney, Louise Turner, says that at that time she told Hicks to pay the balance due to Cherry Hulsey's attorney, Charles M. Coleman. Hicks denies this, and insists that he tried unsuccessfully to find out from Turner in October 1991 where payment of the balance to Cherry Hulsey was to be made. Cherry Hulsey returned to using her maiden name of Dunn and moved to a new address during this time; the Booths and Hicks were unaware of this until later.
Cherry Dunn learned of the assignment to Hicks sometime after the due date on the bond for title of October 3, 1991, when her attorney, Coleman, contacted the Booths' attorney, Turner, about payment of the balance due on the bond for title. Turner wrote Hicks on November 4, 1991, and informed him that Cherry Dunn (formerly Hulsey) had received the bond for title in the property settlement from her divorce, and that Dunn considered him in default on the payment of the balance due on the bond for title. Hicks received the letter on November 6, and he immediately tendered payment of the balance due under the bond for title to Coleman, who refused the tender.
On November 14, 1991, Hicks sued Cherry Dunn and the Booths, alleging a breach of contract and claiming damages for that alleged breach and requesting specific performance of Dunn's agreement to sell Lot 13. Dunn filed a counterclaim against Hicks and a cross-claim against the Booths, requesting that all rights, title, and interest of the Booths and Hicks to Lot 13 be terminated and that Hicks and the Booths be ordered to execute a recordable instrument releasing their interest in the property. Dunn moved for a summary judgment. The trial court, after a hearing and a consideration of the motions, pleadings, depositions, and arguments of counsel, entered a partial summary judgment for Dunn on October 7, 1992, declaring that any interest in the property claimed by Hicks or the Booths was terminated because payment of the balance due was not timely made under paragraph 2 of the subordination agreement,[3] and granting relief on Dunn's cross-claim and counterclaim, declaring all interest in the property to be vested in Dunn. The Booths received a judgment in their favor on Hicks's remaining claims against them on October 15, 1992. Hicks appeals from the partial summary judgment in favor of Dunn.
We must place our two standards of review in juxtaposition in reviewing the summary judgment on the claim for specific performance. Gulf City Body Trailer Works, Inc. v. PhoenixProperties Trust, Inc., 531 So.2d 870, 872 (Ala. 1988). Specific performance is an equitable remedy that rests largely in the discretion of the trial court, based on a consideration of the particular circumstances of each case. The trial court's ruling may be overturned only if it is shown to be palpably erroneous. Allen v. Storie, 579 So.2d 1316, 1318-19 (Ala. 1991).
 "A summary judgment is proper when there exists no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56, A.R.Civ.P. In determining whether a summary judgment was properly entered, *Page 917 
this Court will view the evidence in a light most favorable to the nonmovant and will resolve all reasonable doubts concerning the existence of a genuine issue of material fact against the moving party. In determining the existence or absence of a genuine issue of material fact, this Court is limited to a consideration of the factors that were before the trial court when it ruled on the summary judgment motion. However, this Court's reasoning is not limited to that applied by the trial court."
Chatham v. CSX Transp., Inc., 613 So.2d 341, 343 (Ala. 1993) (some citations omitted). Once the moving party makes a prima facie showing that no genuine issue of material fact exists, the burden of proof shifts to the nonmovant to provide "substantial evidence" creating a question of material fact. Alabama Code 1975, § 12-21-12; Allen v. Storie,579 So.2d at 1318.
As an assignee of their contract rights, Hicks is bound by the obligations of the Booths to Dunn under the bond for title and the subordination agreement. The terms of the contracts, the forfeiture clause in each, and the 30-day grace period in the contract clearly manifest the parties' intention that time be of the essence. The contract expressly required strict compliance with its terms of performance for payment of the balance of the purchase price when due. Although the parties disagree as to whether the 30-day grace period of the bond for title should have been applied to the payment date under the subordination agreement, there is no dispute over the fact that Hicks did not tender payment to Dunn's attorney until November 6, 1991, more than 30 days after the due date of October 3, 1991.
Hicks contends that Dunn waived the provision that time be of the essence through her conduct under the agreement to sell Lot 13. His contention that Dunn waived her right to declare a forfeiture for untimely performance when the Hulseys granted a one-year extension to the Booths is misplaced, because the granting of an extension with a grace period is evidence that the parties consider time to be of the essence. Bell v. Coots,451 So.2d 268, 269 (Ala. 1984). His argument that Dunn's failure to declare a forfeiture when the Booths did not timely pay taxes on the land as required by the bond for title is likewise misplaced, because the contract gave Dunn the option of either terminating the contract, or paying the taxes herself and requiring repayment by the purchaser. There is no evidence that Dunn waived the time requirement in the contract, and the trial court's conclusion that Dunn did not waive her rights under the contract was not palpably erroneous. Dunn was entitled to strict compliance with the terms of the agreement, including the forfeiture provision. Id. at 269-70.
We note that the place for payment of the balance due was not indicated in the contract or in the subordination agreement, and that Cherry Hulsey's change of name and address created some confusion as to where the payment should have been made. However, the date for performance was clearly stated in the subordination agreement, and Hicks testified that he never read either document carefully. A party to a contract should exercise due diligence in performing the obligations under that contract.
Hicks contends that Dunn's failure to inform him or the Booths of her new name and address should excuse his failure to perform, citing Holmes v. Myles, 141 Ala. 401, 37 So. 588
(1904). In Holmes, the owner of land subject to an option contract was unavailable the day the option came due. This Court held that the right of the purchaser to exercise the option "was not subject to be defeated by any voluntary act on the part of defendant, whether done with intent to defeat the exercise of the option or not." 141 Ala. at 405, 37 So. at 589. Specific performance was compelled because the purchaser "acted with due promptness in attempting to communicate to [the owner] his acceptance of the option." Id. His attorneys went to the owner's residence, discovered she was visiting 50 miles away at a place 16 miles off the railroad, and left a letter at her residence exercising the option and indicating that *Page 918 
the purchaser was ready and willing to tender the purchase price, and, in addition, mailed a subsequent letter to her exercising the option. Id. The purchaser's actions there showed due diligence during an era with, by today's standards, no mass communication and no expedient means of transportation. Hicks did not exercise a similar due promptness in his attempts to contact Ms. Dunn that would compel specific performance in this day and age.
The use of a bond for title to convey land is an archaic means to transfer ownership of land, whose use no longer comports with its original purpose. See Bonds for Title inAlabama, note 1, supra. "In fact, the reference to a land contract as a 'bond for title' is a confusion in terms. The earliest cases concerned land contracts in which, in addition to the vendor's promise contained in the agreement, the vendor also gave a bond conditioned on his making title to the land when the consideration was paid." Gay v. Tompkins,385 So.2d 973, 978 (Ala. 1980). A law review article over 40 years ago concluded that the use of bonds for title in the conveyance of land was intended to avoid excessive costs when purchasing small tracts of land, but that the practice was generally disfavored as dangerous and unsound because it is more likely to result in litigation than the use of a mortgage transaction is. Bonds for Title in Alabama, supra. The use of a bond for title to convey land should be very carefully considered if not entirely abandoned.
The judgment of the trial court is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, HOUSTON and KENNEDY, JJ., concur.
[1] "A bond for title is a conditional contract for the sale of land whereby the vendor covenants to make title to the vendee upon payment of the purchase price." J. Thaddeus Salmon, Comment, Bonds for Title in Alabama, 3 Ala.L.Rev. 327, 327 (1951). A bond for title is an executory contract for the sale of land which creates an equitable mortgage on the land. Id. at 328.
[2] The Booths paid $1000 for the one-year extension under the subordination agreement, and allowed the Hulseys to increase the amount of their existing mortgage on Lot 13. The agreement also provided that the Booths' interest in the property would be subordinate to the interest of the mortgagee.
[3] Paragraph 2 stated:
 "2. Should the Booths fail to perform [i.e., fail to make payment under the bond for title] on October 3, 1991, all their interest in and to the property shall terminate, provided further that upon such termination the Booths agree to provide the Hulseys with a duly executed instrument in recordable form releasing their interest in and to said property."